## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| KAREN and MELVIN DREWS, a married couple, individually, and on behalf of all others similarly situated,<br><br>         Plaintiffs,<br>   v.<br><br>GENERAL MOTORS LLC, ONSTAR LLC, LEXISNEXIS RISK SOLUTIONS, INC., and VERISK ANALYTICS, INC.,<br><br>         Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Karen Drews and Melvin Drews, on behalf of themselves and all others similarly situated, by and through the undersigned counsel, bring this action against Defendants General Motors Company, General Motors, LLC, LexisNexis Risk Solutions, Inc., and Verisk Analytics, Inc., and alleges the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of counsel.

## INTRODUCTION

1.      The number of Internet-enabled vehicles has grown logarithmically in recent decades, paving the way for auto manufacturers to collect tremendous amounts of data from their drivers. That data often includes drivers' vehicle locations, vehicle use, driving behavior, trip and performance data, as well as personal identifying information including names, addresses, email address, and phone numbers.

2.      Defendant GM, however, has not used that data for mere safety and quality monitoring. It has instead commoditized that data—including drivers' mileage, braking, acceleration and speed (the "Driver Data")—by selling it to data broker Defendants LexisNexis and Verisk. Moreover, as described further below, GM has sold the Driver Data to these third parties for profit without their drivers' consent or knowledge.

1

3.      It does not end there. After purchasing Driver Data from Defendant GM, Defendants LexisNexis and Verisk then re-commoditize that data by selling it to insurance companies, who then use that data to justify charging higher insurance rates or offer higher quotes.

4.      For Defendant GM's purchasers and lessees, it all begins with their vehicles' OnStar Smart Driver feature. Smart Driver is a free service offered by GM that is innocuously described as a service to improve driver behavior and safety, with drivers earning "badges" for developing driver patterns like braking slowly, limiting hard accelerations, and wearing seatbelts.

5.      Some drivers enroll in the Smart Driver feature at the dealership or afterwards, but are never informed during the enrollment process that their Driver Data will be shared with (and sold to) LexisNexis or Verisk, who will then sell it to insurance companies. Other drivers never enroll in the Smart Driver feature but later discover that their Driver Data was still collected by Defendant GM and sold.

6.      Plaintiffs bring this action against Defendants on behalf of themselves and all those similarly situated for damages and equitable relief, including restitution and injunctive relief.

## JURISDICTION & VENUE

7.      This Court has original jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy, exclusive of interest and costs, exceeds the sum

or value of $5,000,000 and is a class action in which there are in excess of 100 class members, and some of the members of the class are citizens of states different from Defendants.

8.      This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because they conduct substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

9.      Venue is proper in this District under 28 U.S.C. § 1391 because Defendants transact business within this District, and a substantial part of the events or omissions giving rise to the claims arose in this District.

## PARTIES

### A.      Plaintiffs

10.      Plaintiffs Karen Drews and Melvin Drews ("Plaintiffs" or "the Drews") are a married couple and citizens and residents of the State of Michigan, residing in Concord, Michigan.

11.      On or about May 6, 2020, the Drews purchased a 2019 Chevrolet Corvette from Mike Anderson Chevrolet in Merrillville, Indiana. The Drews had no knowledge that the vehicle was equipped with OnStar or Smart Driver. The Drews never activated the OnStar Smart Driver service and have no knowledge of ever

agreeing to share their driver data through Defendant GM with Defendants LexisNexis or Verisk.

12. On or about March 17, 2020, the Drews purchased a 2020 Buick Enclave from Jim Winter GMC Auto Group in Jackson, Michigan. The Drews had a free trial active OnStar subscription from the date of purchase of the vehicle until on or about June 17, 2020. The Drews affirmatively cancelled their OnStar subscription for the Enclave to avoid incurring any charges for that service. The Drews never activated the OnStar Smart Driver service and have no knowledge of ever agreeing to share their driver data through Defendant GM with Defendants LexisNexis or Verisk.

13. On or about January 2, 2024, the Drews were notified by their insurer that their insurance rates would nearly double from approximately $1,940.87 per year to $3,741.03 per year. They asked their insurer why their rates were increasing, and they were told that it was because of a credit pull from Defendant LexisNexis, and that Plaintiffs could request the report directly from that company. On or around January 8-25, 2024, Plaintiffs received reports from LexisNexis, which exceeded 200 pages, over 150 pages of which was detailed information about car trips that Plaintiffs took in both vehicles in the prior six months, including information about the date and time of each trip, the distance and location, and driving details such as rapid acceleration and hard braking.

14.      On or about April 30, 2024, the Drews received the following email from Chevrolet, concerning their 2019 Chevrolet Corvette:



Dear Melvin,

We are reaching out to inform you that we are discontinuing the Smart Driver service on June 26, 2024.

As a result, you will no longer be able to access the Smart Driver features in your myChevrolet mobile app.

No other OnStar services are impacted by this change.

If you have any questions, please check out our FAQs here: Smart Driver FAQs.

Sincerely,
OnStar Member Services



15.     This email came as a surprise to the Drews because until this time they were unaware that the Corvette was even equipped with OnStar, let alone the Smart Driver feature that was tracking their every trip. The Drews did not receive a similar email with respect to the Buick Enclave.

   **B.     Defendants**

16.     Defendant General Motors Company is a Delaware corporation, which has its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan.

17.     General Motors, LLC is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.

18.     Defendants General Motors Company and General Motors, LLC are jointly referred to herein as "GM."

19.     Defendant OnStar LLC is a Delaware corporation headquartered in Detroit, Michigan.

20.     Defendant LexisNexis Risk Solutions, Inc. is a Delaware corporation headquartered in Alpharetta, Georgia.

21.     Defendant Verisk Analytics, Inc., is a Delaware corporation headquartered in Jersey City, New Jersey.

## FACTUAL ALLEGATIONS

### A.     Auto Manufacturers—Including GM—Increasingly Collect and Sell Drivers' Data

22.     Although vehicles have come equipped with computers since the 1970s, the number of internet-connected passenger vehicles has grown logarithmically in recent decades and are now firmly planted in the larger Internet of Things ecosystem.

23.     According to consulting firm McKinsey, 95% of new vehicles are predicted to be internet-connected by 2030.[1] These "computers on wheels" collect tremendous amounts of sensitive data from drivers through microphones, cameras, and sensors in the vehicle, connected services from the vehicle's dashboard, like satellite radio or navigation, as well as plug-in telematics devices and smart phones, to name a few.

24.     While auto insurance companies often offer consumers incentives to those who install dongles in their vehicles' onboard diagnostic (OBD-II) ports or install smartphone apps that monitor their driving behavior, at least one auto manufacturer—Ford—has admitted that "drivers are historically reluctant to

---

[1]     Ex. 1, Cheryl Winokur Munk, *New cars are now 'the worst' products when it comes to protecting consumer data*, CNBC, Mar. 23, 2024, https://www.cnbc.com/2024/03/23/how-to-stop-your-internet-connected-car-from-selling-your-driving-data.html#:~:text=By%202030%2C%20more%20than%2095,for%20industry%20players%20by%202030 (last accessed Apr. 24, 2024).

participate in these programs."[2] Therefore, to circumvent that reluctance, auto manufacturers, including Defendant GM, often collect data directly from drivers' internet-connected vehicles.

25.     According to an in-depth report by Mozilla that raised alarms regarding vehicles and data privacy, auto manufacturers broadly collect driver data, including: personal identifying information, mobile device location, financial account numbers, credit card numbers, medical information, disability status, voiceprints, health information, and even marital status, to name a few.

26.     Auto manufacturers use this information for internal purposes, but also share—often for profit—that data to third parties:

---

[2]     Ex. 2, Kashmir Hill, *Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies*, The New York Times, Mar. 11, 2024, https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html (last accessed Apr. 24, 2024).



27.     Making matters worse, auto manufacturers often make it difficult for consumers to understand what data of theirs are being collected and to whom the vehicle is sharing and selling data. Auto manufacturers' privacy policies often only vaguely list categories of businesses with whom they are sharing this data, like "service providers," and when they do name specific businesses, they add vague qualifiers, like "such as," "etc.," and "or similar."

28.     While it is often unclear to consumers who the data is being shared with, the reason for collecting the data is clear: Defendant GM, for instance, in 2022 had more than eight million vehicles included in its Smart Driver program (discussed further below), which translated into millions of dollars in annual revenue.[3] Indeed,

---

[3]     *Id.*

as warned by California nonprofit Consumer Watchdog: "car data is the new gold rush of the auto industry . . . Automakers and third-party companies know where we drive, what we buy, eat, our texts. A whole consumer profile is created with this information to essentially sell you things."[4]

29.     Government agencies have taken notice. In 2023, the California Privacy Protection Agency (CPPA) revealed that its Enforcement Division is looking into vehicles embedded with features like location sharing, web-based entertainment, smartphone integration, and cameras. "Modern vehicles are effectively connected computers on wheels. They're able to collect a wealth of information via built-in apps, sensors, and cameras, which can monitor people both inside and near the vehicle," says CPPA Executive Director Ashkan Soltani.[5]

30.     The CPPA declared that vehicle privacy considerations "are critical because these vehicles often automatically gather consumers' locations, personal preferences, and details about their daily lives."[6]

---

[4]     Ex. 3, David Shepardson, *California agency probes automakers' data privacy practices*, Reuters, July 31, 2023, https://www.reuters.com/business/autos-transportation/california-agency-probes-automakers-data-privacy-practices-2023-07-31/ (last accessed Apr. 24, 2024).

[5]     Ex. 4, *CPPA to Review Privacy Practices of Connected Vehicles and Related Technologies*, July 31, 2023, https://cppa.ca.gov/announcements/2023/20230731.html. (Last accessed Apr. 24, 2024).

[6]     *Id.*

31.     In December 2023, Senator Edward J. Markey (D-Mass.) wrote to fourteen auto manufacturers inquiring into their data collection and privacy practices. Their response, including Defendant GM's, largely failed to answer Senator Markey's questions regarding whether they commoditized drivers' data. For instance, when asked whether it sold, transfer, shared, or otherwise derived a commercial benefit from the driver data it collected, GM responded:

> If an owner opts in to Connected Services, GM has the ability to share data collected from Vehicles with third parties, as outlined in our US Connected Services Privacy Statement. For example, data might be shared to help emergency responders respond more quickly and accurately, to support in-vehicle services utilized by the owner, and where the owner directs GM to do so (such as helping owners optimize their charging patterns). For those limited data shares where there is a commercial benefit attributable directly to the data sharing, the impact to GM's overall 2022 revenue was de minimis.[7]

32.     Notably, GM said nothing in response to Senator Markey's letter about how it was selling driver data to Defendants LexisNexis or Verisk, who were then selling that data to insurance companies.

33.     GM's and other auto manufacturers' vagueness prompted Senator Markey to write to the Federal Trade Commission (FTC) to investigate the data privacy practices of auto manufacturers.

---

[7]     Ex. 5, https://www.markey.senate.gov/imo/media/doc/senator_markey_letter_to_ftc_on_auto_privacy__022824pdf.pdf (last accessed Apr. 24, 2024).

34.     Writing to FTC Chair Khan, Senator Markey voiced their concern that auto manufacturers are collecting large amounts of data on drivers, passengers, and even people outside the vehicle, with little to no oversight.[8] As an example, he cited location data having been exploited in some instances by abusive partners to track domestic violence victims. Senator Markey urged the FTC to take all necessary steps to protect user privacy. Senator Markey wrote:

> "With new advances in vehicle technology and services, automakers have been vacuuming up huge amounts of data on drivers, passengers, and even individuals outside the vehicle. Based on public reporting and responses to my own inquiries into these practices, automakers face few, if any, limitations on the collection, use, and disclosure of this data. Consumers are often left in the dark. I therefore urge the FTC to investigate the automakers' data practices and take all necessary actions to protect the privacy of all road users.
>
> ***
>
> "This ambiguity and evasiveness calls out for the investigatory powers of the FTC. Given the serious risks to consumer privacy, I urge the Commission to use the full force of its authorities to investigate the automakers' privacy practices and take all necessary enforcement actions to ensure that consumer privacy is protected. The auto industry cannot become yet another domain that tracks and targets consumers."

---

[8]     Ex. 6, Sen. Edward J. Markey, Feb. 27, 2024, https://www.markey.senate.gov/imo/media/doc/senator_markey_letter_to_ftc_on_auto_privacy__022824pdf.pdf (last accessed Apr. 24, 2024).

**B.     GM Shares and Sells the Driver Data Without Drivers' Consent or Knowledge**

35.     GM collected, shared and sold Driver Data often without drivers' consent or knowledge. It did so through its OnStar Smart Driver program, accessible from its myChevrolet, myBuick, myGMC, and myCadillac smartphone apps.






36.     Using these smartphone apps, drivers can access Smart Driver, a gamified internet-connected service that allows drivers to earn digital "badges" like

"Brake Genius," "Accel Pro," and "Belt Boss," through certain driving behavior. GM innocuously describes Smart Driver as a service that "provides you with information about your driving behavior to help maximize your vehicle's overall performance, reduce vehicle wear and tear, and help you become a better driver."[9]

37.    In a promotional campaign, a social media influencer and "#OnStarAmbassador" promoted Smart Driver by showing the badges she and her husband were competing to earn through using the myGMC and myCadillac smartphone apps to "track our driving progress…"



_____

[9]    Ex. 7, https://www.onstar.com/services/smart-driver (last accessed Apr. 25, 2024).

38.     According to GM, drivers enable Smart Driver "at the time of purchase or through their vehicle mobile app."[10] In practice, however, this is a form of "stealth enrollment" in which drivers are unknowingly signed up at the dealership, which—according to a GM manual—earns salespeople bonuses for successfully enrolling purchasers and lessees.

39.     Some drivers never activate Smart Driver and still have their Driver Data collected by GM, sold to LexisNexis and/or Verisk, and then sold to insurance companies. In certain situations, drivers have been alarmed to find out that this is happening and then confirm that the Smart Driver feature is indeed not activated.

40.     But even those who enroll in Smart Driver are not informed that their Driver Data will be sold to LexisNexis and/or Verisk and then sold to insurance companies. During that enrollment process, drivers accept user terms and a privacy statement outside of the enrollment flow, in which they vaguely consent to sharing data with third parties.

---

[10]     Ex. 8, Kashmir Hill, *How G.M. Tricked Millions of Drivers Into Being Spied On (Including Me)*, The New York Times, April 23, 2024, https://www.nytimes.com/2024/04/23/technology/general-motors-spying-driver-data-consent.html (last accessed Apr. 24, 2024).



41.     However, GM's Privacy Statement says nothing of Smart Driver and does not identify LexisNexis or Verisk. It instead only identifies SiriusXM as a company it might share data with and fails to disclose how it will commoditize the drivers' data:

> **Third-Party Business Relationships:** With business that GM enters into business relationships, such as SiriusXM, in connection with their products and services; research institutes, for research and development purposes (for example, improving highway safety); or dealers, fleet, or rental car companies, for service or maintenance of your vehicle. We may also share data with third parties for marketing activities (with necessary consents) or where you have elected to receive a service from them and/or authorized them to request data from GM (for example, financial organizations who offer financing for the purchase or lease of GM vehicles or usage based insurance providers).

42.     Unbeknownst to drivers, GM sends LexisNexis and Verisk Driver Data, who then sell that data—"driver risk profiles"—to insurance companies. In one example, a [GM-brand] Chevy Bolt lessee discovered that their insurance rates had increased 21% and had no idea that their information was being tracked and shared.

43.     Others have reported on forums their surprise at learning that GM had shared Driver Data with LexisNexis:

> I logged into the myChevrolet app, and as Boomer detailed I was enrolled too even though I've never paid for OnStar. Thank you 2020Colorado for bringing this to our attention! There was definitely driving information there that nobody else should see![11]
>
> ***
>
> Thanks 2020Colorado for posting this. I had never installed the My Chevrolet app until 5 minutes ago and lo and behold I was enrolled in this invasive plan; but not anymore.[12]
>
> ***
>
> I received a letter from LexisNexis that my records showed a negative report on my file (required by Colorado Law). I had never heard of them and asked for a report to be sent to me. I got a 98 page report that is similar to a credit report with all my former addresses and credit cards listed along with my property and business history. It also had a "Telemetrics" category that had several pages of my Smart driver events listed. LexisNexis is a company that

---

[11]     Ex. 9, https://www.midenginecorvetteforum.com/forum/me-discussion-photos-videos/420220-heads-up-beware-of-the-smart-driver-feature-of-onstar (last accessed Apr. 24, 2024).

[12]     *Id.*

aggregates info from various sources and resells it to several industries including insurance companies....[13]

44.     If drivers request their driver records from LexisNexis and/or Verisk, like the Drews did, they may receive a voluminous "consumer disclosure file" that breaks down trips made during the past six months, including the distances traveled, start and end times, hard braking, or rapid acceleration events.

45.     Up until recently, GM's FAQ webpage regarding Smart Driver included information about vehicle compatibility, how to enroll, availability, and the types of data collected, but said nothing about whom GM shared or sold such data with.[14] However, GM updated its FAQ webpage by adding a separate header: "Do you share the data with LexisNexis or Verisk, or other third-party telematics exchange companies." Under the header, GM states: "As of March 20, 2024, OnStar Smart Driver customer data is no longer being shared with LexisNexis or Verisk. Customer trust is a priority for us, and we are actively evaluating our privacy processes and policies."[15]

46.     GM also recently included a header on its FAQ webpage regarding removing data from LexisNexis and Verisk. However, GM merely provides links to

---

[13]     *Id.*
[14]     Ex. 10, https://web.archive.org/web/20240116231547/https://www.onstar.com/support/faq/smart-driver (last accessed Apr. 24, 2024).
[15]     Ex. 7, https://www.onstar.com/services/smart-driver (last accessed Apr. 25, 2024).

LexisNexis' and Verisk's websites, where they can "follow up with the companies directly to access reports and learn more."[16]

## TOLLING

47.     The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that Defendant GM was sharing and selling Driver Data to Defendants LexisNexis and/or Verisk and that Defendants LexisNexis and Verisk were then selling Driver Data to insurance companies.

48.     Plaintiffs and Class members had no realistic ability to discern that Defendants were collecting and selling their Driver Data until—at the earliest— March 11, 2024, when it was reported in The New York Times that Defendant GM was collecting and selling Driver Data through the Smart Driver service to Defendants LexisNexis and Verisk without drivers' knowledge and/or consent. Even then, Defendant GM still collected and sold Driver Data with the Smart Driver service deactivated.

## CLASS ALLEGATIONS

49.     Plaintiffs, pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3), bring this action on behalf of a proposed Class (the "Nationwide Class") defined as follows:

> All persons who are the current or former owners, purchasers or lessees of GM-brand vehicles equipped with OnStar Smart Driver for sale or

---

[16]     *Id.*

lease in any of the fifty States, the District of Columbia, Puerto Rico, and all other United States territories and possessions.

50.     Plaintiffs also brings this class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a proposed Multistate Class defined as:

> All persons who are the current or former owners, purchasers or lessees of GM-brand vehicles equipped with OnStar Smart Driver for sale or lease in the State of Michigan and all other states with sufficiently similar applicable laws.

51.     Plaintiffs also brings this class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a proposed Michigan Class defined as:

> All persons who are the current or former owners, purchasers or lessees of GM-brand vehicles equipped with OnStar Smart Driver for sale or lease in the State of Michigan.

52.     Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any of Defendants' officers or directors, any successors, all persons who make a timely election to be excluded from the Class, and any judge who adjudicates this case, including their staff and immediate family.

53.     Plaintiffs reserve the right to amend the class definition or add subclasses.

54.     Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

55.      **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that individual joinder of all Class members is impracticable. There are, at a minimum, thousands of members of the proposed Class.

56.      **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

    a.   Whether Defendant GM and/or OnStar LLC collected, shared and/or sold Class members' Driver Data to third parties, including to Defendants LexisNexis and/or Verisk;

    b.   Whether Defendants GM and/or OnStar LLC collected, shared and/or sold Class members' Driver Data to third parties without Class members' knowledge or consent;

    c.   Whether Defendant LexisNexis shared and/or sold Driver Data, as provided by Defendant GM and/or OnStar LLC, to third parties;

    d.   Whether Defendant LexisNexis shared and/or sold Driver Data, as provided by Defendant GM and/or OnStar LLC, to third parties without Class members' knowledge or consent;

e.   Whether Defendant Verisk shared and/or sold Driver Data, as provided by Defendant GM and/or OnStar LLC, to insurance companies;

f.   Whether Defendant Verisk shared and/or sold Driver Data, as provided by Defendant GM and/or OnStar LLC, to third parties without Class members' knowledge or consent;

g.   Whether Plaintiffs and Class members are entitled to monetary damages and the measure of those damages;

h.   Whether Plaintiffs and Class members are entitled to restitution, disgorgement, or other equitable or injunctive relief; and

i.   Whether Plaintiffs and Class members are entitled to an award of attorneys' fees, and the proper amount of attorneys' fees.

57.   These common questions of law and fact predominate over questions that affect only individual Class members.

58.   **Typicality—Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs' claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Defendants' conduct.

59.   **Adequacy—Federal Rule of Civil Procedure 23(a)(4):** Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation.

60.      **Superiority—Federal Rule of Civil Procedure 23(b)(3):** Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

61.      Defendants have acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the Michigan Consumer Protection Act**
**Mich. Comp. Laws Ann. § 445.901, *et seq*.**
**(On behalf of Plaintiffs and the Nationwide Class, or Alternatively the Michigan Class)**

62.      Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

63.      Defendant GM and Plaintiffs are "person[s]" as defined by Mich. Comp. Laws Ann. § 445.902(1)(d).

64.      Defendant GM advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.902(1)(g).

65.     Defendant GM engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including: "Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." Mich. Comp. Laws Ann. § 445.903(1)(s).

66.     Defendant GM failed to reveal to Plaintiffs the material fact that they were collecting their driver data and then selling that data to Defendants LexisNexis and Verisk, who were then selling that data to insurance companies.

67.     Defendant GM's omissions were material because they were likely to deceive reasonable consumers to believe their driver data would not be sold by Defendant GM to Defendants LexisNexis and/or Verisk, and then sold to insurance companies.

68.     Defendant GM intended to mislead Plaintiffs and induce them to rely on its omissions.

69.     Defendant GM acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded Plaintiffs' rights.

70.     As a direct and proximate result of Defendant GM's unfair, deceptive, and unconscionable trade practices, Plaintiffs has suffered and will continue to suffer

injury, ascertainable losses of money or property, and monetary and non-monetary damages.

71.    Plaintiffs have suffered injuries in fact and lost money or property due to Defendant GM's business acts or practices. Plaintiffs' driver data have tangible value. Plaintiffs' personal content is in the possession of third parties—including Defendants LexisNexis and Verisk and insurance companies, who have used and will use it for their own advantage, including financial advantage, or was and is being sold for value, making it clear that the personal content has tangible value.

72.    Plaintiffs' driver data were exploited without informed consent. Accordingly, Plaintiffs are entitled to part of Defendant GM's profits that were generated by their driver data without informed consent.

73.    Plaintiffs seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, injunctive relief, and any other relief that is just and proper.

## SECOND CAUSE OF ACTION

### Violations of Common Law Right to Privacy
### (On behalf of Plaintiffs and the Multistate Class)

74.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

75.     The common law prohibits the use of a person's name or likeness for the defendant's advantage, commercial or otherwise, without first obtaining that person's consent, or where appropriate the consent of that person's legal guardian.

76.     Defendant GM violated this section by allowing access to Plaintiffs' likeness—including names and other personal identifying information—as a service to third parties without consent.

77.     Prior to using Plaintiffs' likeness, Defendant GM never obtained their consent.

78.     Plaintiffs did not receive any compensation in return for this use

79.     Plaintiffs were harmed by Defendant GM's improper use.

80.     Plaintiffs seek actual damages suffered, plus any profits attributable to Defendant GM's use of the unauthorized use not calculated in actual damages. Plaintiffs and class members also reserve the right to punitive damages, costs, and reasonable attorney's fees as allowed by statute.

### THIRD CAUSE OF ACTION

**Breach of Contract**
**Against Defendant GM**
**(On behalf of Plaintiffs and the Nationwide Class)**

81.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

82.     GM's Privacy Statement was a contract between GM and purchasers and lessees of GM vehicles, including Plaintiffs.

83.     Drivers who use myChevrolet, myBuick, my GMC, myCadillac, or mobile apps are governed by the "User Terms for Application Services." The terms of use incorporates the "User Terms for Connected Vehicle Services" located at OnStar.com for additional terms of use, and to the "Privacy Statement for Application Services."

84.     The "Privacy Statement for Application Services" last updated on May 2, 2022, was a contract between GM purchasers and lessees that sets forth how information is collected and used, but only vaguely states that GM collects "vehicle-related information" and "driving information," using as an example the location and speed of a vehicle based on GPS. It says nothing about collecting driver data to share with third parties for commercial purposes.

85.     Defendant GM violated the Privacy Statement by collecting Driver Data and selling it to Defendants LexisNexis and Verisk.

86.     As a direct and proximate result of Defendant GM's breach of contract, Plaintiffs and other Class Members have been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment
### (On behalf of Plaintiffs and the Nationwide Class, or Alternatively the Multistate Class)

87.     Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

88.     Plaintiffs and other Class Members conferred benefits on Defendants by, *inter alia*, purchasing or leasing GM vehicles and by providing to Defendants, without consent, their Driver Data for Defendants' use in commercial pursuits.

89.     Defendants were unjustly enriched in retaining revenues derived from Plaintiffs' and other Class Members' purchase or lease of GM vehicles, as well as revenue obtained from the unauthorized access, use, and commoditization of the Driver Data.

90.     Defendants' retention of those moneys under these circumstances is unjust and inequitable.

91.     Defendants' conduct as alleged herein caused injury to Plaintiffs and other Class Members.

92.     Because Defendants' retention of non-gratuitous benefits conferred on it by Plaintiffs and other Class Members is unjust and inequitable, Defendants have been unjustly enriched in an amount to be determined at trial.

## RELIEF REQUESTED

93.    Plaintiffs, on behalf of themselves and all others similarly situated, request the Court enter judgment against Defendants as follows:

    a.    An Order declaring this action to be a proper class action, appointing Plaintiffs as Class Representative, and appointing Plaintiffs' undersigned counsel as Class Counsel;

    b.    An Order requiring Defendants to bear the cost of Class Notice;

    c.    A judgment awarding Plaintiffs and other Class Members appropriate monetary relief, including statutory, actual, compensatory, and punitive damages (as permitted by law), in an amount to be determined at trial;

    d.    A judgment awarding any and all further equitable, injunctive, and declaratory relief as may be appropriate;

    e.    Pre-judgment and post-judgment interest, as permitted by law;

    f.    Attorneys' fees and costs; and

    g.    Any other and further relief that Court deems necessary, just, or proper.

Respectfully submitted,

Dated: May 3, 2024              THE MILLER LAW FIRM

By: */s/  E. Powell Miller*

E. Powell Miller (P39487)
Emily E. Hughes (P68724)
Dennis A. Lienhardt (P81118)
950 W. University Dr., Suite 300
Rochester, MI  48307

Tel: 248/843-0997
248/652-2852 (fax)
epm@millerlawpc.com
dal@millerlawpc.com
gam@millerlawpc.com

COTCHETT PITRE &
McCARTHY LLP
Thomas E. Loeser
Karin B. Swope
999 N. Northlake Way, Suite 215
Seattle, WA  98103
Tel: 206/802-1272
650/697-0577 (fax)
tloeser@cpmlegal.com
kswope@cpmlegal.com

BLOOD HURST & O'REARDON, LLP
Timothy G. Blood (CA149343)
James M. Davis
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
jdavis@bholaw.com

*Attorneys for Plaintiffs*